*641 OPINION OF THE COURT
David B. Saxe, J.
Jazz musicians in New York City, often identified as the jazz capital of the world, are faced with an unusual regulatory scheme for the expression of their musical talents.
Plaintiffs are three individuals and a musician’s union, who work and thrive within the jazz community of New York City. Warren Chiasson primarily plays the vibraphone; Mark Morganelli plays the trumpet; Carol Cass is a jazz singer; and Local 802 of the American Federation of Musicians is a craft union which has members who play wind, brass and percussion instruments. These plaintiffs have brought a declaratory judgment action to challenge the constitutionality of a New York City ordinance and a zoning resolution which they contend is arbitrary and infringes upon their constitutionally protected right to freedom of expression.
The motion now before me is for mandatory injunctive relief against the enforcement of these provisions (CPLR 6301). Plaintiffs contend that the continued enforcement of these unconstitutional provisions cause them irreparable damage in that they have been unable to play the instruments of their choice at certain clubs. Because of the restriction in the law as to type and number of musical instruments which they can play in unlicensed or noncabaret establishments these plaintiffs cannot work in small jazz clubs or coffeehouses.
The complex regulatory scheme at issue is governed by Administrative Code of the City of New York article 38. Under this scheme, cabarets, public dance halls, and catering establishments must be licensed. (Administrative Code § B32297.0.) A cabaret is defined as any place where entertainment such as music, singing or dancing is offered in connection with the sale of food or drink. (Administrative Code § B32-296.0.) However, there is an exemption from this licensing requirement for eating and drinking establishments which provide incidental musical entertainment. Incidental musical entertainment is defined as that which is provided "either by mechanical devices, or by not more than three persons playing piano, organ, accordian or guitar or any stringed instrument or by not more than one singer accompanied by himself or a person playing piano, organ, accordian, guitar or any stringed instrument” (Administrative Code § B32-296.0 [3]).
A similar distinction is contained in the New York City Zoning Resolutions. In certain local retail districts, under New *642 York City Zoning Resolution § 32-15, only eating or drinking places which provide incidental musical entertainment are permitted. The definition of incidental musical entertainment parallels the definition in the Administrative Code but does not encompass the singer. New York City Zoning Resolution § 32-21 permits eating or drinking places in certain commercial districts without restriction on entertainment or dancing.
The plaintiffs challenge the manner in which the law defines the term "incidental musical entertainment”. They contend that this definition is arbitrary and capricious and discriminates against them, because it excludes wind, brass and percussionist instrumentalists and limits the players to three. Therefore, as jazz musicians, the law strenuously impairs their ability to perform in New York, and denies them due process and equal protection of the laws as well as freedom of expression. Simply put, they contend that there is no rational basis for limiting to three the number of musicians who can play in these unlicensed clubs, nor is there a rational basis for permitting only a piano, organ, accordian, guitar or string instrument to play.
The plaintiffs contend that there is no statement of legislative intent which adequately explains this distinction. However, it appears that cabaret licensing was introduced in the city in 1926, as part of an effort to control speakeasies (Recommendation No. 10, Proceedings of Board of Alderman and Municipal Assembly of City of New York [Dec. 7, 1926], at 577). The report of the Committee on Local Laws stated the purpose of the bill: "there has been altogether too much running 'wild’ in some of these night clubs and, in the judgment of your committee, the 'wild’ stranger and the foolish native should have the check-rein applied a little bit” (ibid.).
In 1936, the definition of a cabaret was amended to add the exception for mechanically reproduced music and for a player piano. In 1961, the administration of the law was transferred to the Department of Licenses (now under the Department of Consumer Affairs) and a special licensing system for coffeehouses was established. Local Lawsj 1961, No. 95 of City of New York provided an exception for those "coffee houses” which provided incidental musical entertainment without dancing, either by mechanical devices, or by not more than three persons playing piano, organ, accordian, guitar, or any other string instrument. Thus, only certain coffeehouses had *643 to be licensed, others which provided only incidental musical entertainment did not.
In 1971, the Cabaret Law was changed to its present form and that portion of the exemption for musical entertainment that was contained in the "coffee house law” was incorporated into the exemption under the Cabaret Law. In 1979, Administrative Code article 39 which governed the licensing of coffeehouses was repealed. There is no indication why the City Council adopted the definition of incidental musical entertainment which was contained in the coffeehouse ordinance.
Plaintiffs suggest that there is no expression of the intent of the Legislature, either in introducing the limit of three with respect to the number of instruments, or in the choice of instruments. Rather, the selection of instruments seemed to fit the pattern of what was expected in a coffeehouse as they were identified with the sound, for example, of folk or ethnic music. It is the contention of the plaintiffs that this loose and arbitrary scheme cannot withstand a constitutional attack.
One explanation which the defendants offer for excluding certain types of instruments and for limiting the number to three is noise control. However, as plaintiffs note, that explanation is unpersuasive for under modern conditions of amplification, music from "mechanical devices” such as stereos and electric guitars is as loud as, if not louder than, music from wired and percussion instruments.
Moreover, as the plaintiffs explain, the noise control justification is severely undercut by the enactment of a recent ordinance. Administrative Code § 1403.5.22 limits to 45 decibels the volume of sound audible in a building, but outside the room, where amplified music is being played. As stated in the affidavit of the president of the local union, John Glasel, this bill was initially offered as a part of a compromise package to the City Council, in which reform in the definition of "incidental music” was offered, together with a noise control ordinance. On December 31, 1985 the "Noise Bill” was passed. The other did not. As a result, the amount of noise audible outside an establishment where music is played is limited, regardless of what instruments are played and regardless of whether the band is a trio or a quartet. Therefore, plaintiffs claim there is no constitutional interest which is furthered through limiting the types of instruments which can be played at these unlicensed establishments.
Defendants’ opposing papers barely make reference to this *644 particular argument regarding noise control and the enactment of the noise decibel bill. Rather, the defendants assert that the ordinances and zoning resolutions serve a significant and valid public purpose. It is submitted in the affidavit of Julius Spector, Chief Engineer of the Department of City Planning, that the zoning provisions are specifically designed to safeguard the noise, crowding and congestion which entertainment establishments frequently produce if these establishments are not restricted in some way.
MOTION FOR INJUNCTIVE RELIEF
At the outset it must be recognized that plaintiffs are seeking interim mandatory relief which if awarded will have the same effect as the granting of final and complete relief. Courts are generally reluctant to grant such relief before the parties have an opportunity to a full hearing (7A Weinstein-Korn-Miller, NY Civ Prac If 6301.20).
In order to obtain this relief, the plaintiffs must show that they are entitled to the ultimate relief and that their rights would be seriously injured by permitting the defendant to proceed as it is attempting or threatening to do (People v Hatchamovitch, 40 AD2d 556 [2d Dept 1972]). In addition to these considerations, the court must also be convinced that the balancing of the equities lie in favor of the movants (Faberge Intl. v Di Pino, 109 AD2d 235 [1st Dept 1985]).
The first prong of inquiry must be whether plaintiffs’ constitutional challenge is sufficiently clear to entitle them to the ultimate relief.
CONSTITUTIONAL ANALYSIS
It is virtually conceded by both parties that the kind of freedom of expression that is being curtailed by these provisions is constitutionally protected by the US Constitution 1st and 14th Amendments. The third and fourth causes of action of the complaint seek a declaration as to the constitutionality of these ordinances based on these interests. Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio, and television and live entertainment such as musical and dramatic works also fall within the 1st Amendment guarantee. (Schad v Mount Ephraim, 452 US 61, 65-66 [1981].) In Merco Props. v Guggenheimer (395 F Supp 1322 [US Dist Ct, SDNY 1975]), which involved an unsuccessful constitutional challenge to the New *645 York City cabaret licensing system by a corporation which had been denied a cabaret and catering license, the court stated that the licensing requirement implicates 1st Amendment rights to the extent that musical entertainment, singing and dancing are considered communicative forms of expression as opposed to unprivileged conduct. The plaintiffs here eloquently convey to the court the concept that they use their instruments as an expression of their ideas and thoughts to others. It is in this sense that musical expression is constitutionally protected.
However, it is also recognized that expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place and manner restrictions established by government in furtherance of police power objectives. (Clark v Community for Creative Non-Violence, 468 US 288 [1984].) Thus, as is true of other ordinances, when a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest. (Schad v Mount Ephraim, supra, at p 68.)
There are essentially two portions of these laws which plaintiffs challenge: that which limits the number of musicians to three, and that which restricts the type of instruments. It is clear that defendants have simply failed to set forth what, if any, substantial governmental interest is furthered by refusing to permit percussion, wind, and brass instrumentalists to play in unlicensed clubs. A licensing scheme which ensures that the regulated activity conforms to certain health and safety requirements will be upheld (Merco Props. v Guggenheimer, supra). However, when the ordinance does not rationally relate to State concerns and infringes upon a protected liberty, it should not be sustained. It has already been noted in People v Walter (106 Misc 2d 359 [Crim Ct, NY County 1980]) that mechanical devices today may create more noise than any three-piece band. In addition, any problem with noise control has already been adequately addressed by the noise audible law.
For the same reasons, the restriction on the type of instrument which can accompany a singer also fails to further a legitimate State interest.
However, while the city has failed to persuasively articulate what interest it has in restricting the type of instrument to largely stringed instruments, it has advanced a legitimate reason for limiting the number of instruments. The New York *646 City Zoning Resolution protects local residential neighborhoods from excessive disruptions by permitting eating and drinking establishments in those neighborhoods from providing no more than "incidental musical entertainment”. As stated in the affidavits from the city, without a limit on the number of musicians who play in these neighborhood establishments, the music in these unlicensed clubs could easily become the focal point and major attraction of the facility. In turn, these establishments might attract the traffic and congestion which is inappropriate for local residential areas. The desire to curtail traffic congestion, increased parking and sanitation problems are legitimate State concerns because they can cause a drain on municipal services (Kent’s Lounge v City of New York, Sup Ct, Richmond County, index No. SP 357/82, Aug. 8, 1983, affd 104 AD2d 397 [2d Dept 1984], appeal on constitutional grounds dismissed 65 NY2d 636 [1985]). Thus, the limit on the number of musicians who can play in these clubs directly furthers the city’s interest in managing traffic congestion and preserving the quality and character of the particular neighborhood. (Also see, Renton v Playtime Theatres, 475 US —, 89 L Ed 2d, 29 [1986].)
Accordingly, this court finds no constitutional defect in those portions of the city ordinances and zoning resolutions which limit to three the number of musicians who can play in these unlicensed clubs.
On that prong of inquiry which is concerned with the ultimate success of the underlying action, the plaintiffs have met their burden. The definition of incidental music as contained in the Administrative Code and New York City Zoning Resolution which restricts the type of instruments to only guitar, piano, organ, accordian or any string instrument is unconstitutional. However, those portions of the regulations which permit up to three musicians to play in unlicensed establishments is constitutionally permissible.
THE IRREPARABLE INJURY
Plaintiffs contend that aside from the lost economic opportunities the loss of 1st Amendment freedoms for even minimal periods of time, constitutes irreparable injury. For where there is a significant impairment of 1st Amendment rights, irreparable harm must be presumed. (North St. Book Shoppe v Village of Endicott, 582 F Supp 1428 [US Dist Ct, NDNY 1984].) In opposition, defendants contend that the only pur *647 pose of a preliminary injunction is to preserve the status quo until a decision is reached on the merits of the case.
However, depending on the context, the preservation of the status quo may take on different meanings. (7A Weinstein-Korn-Miller, NY Civ Prac 6301.19.) Admittedly, the challenged provisions have been in effect since 1961. However, failure to grant mandatory injunctive relief will only continue the unjustifiable deprivation of plaintiffs’ rights to freedom of expression. It has been suggested that: " 'it sometimes happens that the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury upon complainant, which he appeals to a court of equity to protect him from. In such a case courts of equity issue mandatory writs before the case is heard on its merits.’ ” (Buchman v Harrington, 184 NY 458, 464 [1906].)
Accordingly, the motion for preliminary injunctive relief is granted solely to the extent of declaring unconstitutional those provisions of the Administrative Code (§ B32-296.0) and New York City Zoning Resolution (§ 32-15) that limit the types of musical instruments which can provide incidental music in unlicensed eating and drinking establishments.